Filed 7/21/20

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| JOSE TORRECILLAS,<br><br>　　Plaintiff and Respondent,<br><br>　　　　v.<br><br>FITNESS INTERNATIONAL, LLC,<br><br>　　Defendant and Appellant. | B296194<br><br>(Los Angeles County<br>Super. Ct. No. BC717782) |

APPEAL from an order of the Superior Court of
Los Angeles County, Maureen Duffy-Lewis, Judge.  Reversed.

Littler Mendelson, Fermin H. Llaguno and Oliver B.
Dreger for Defendant and Appellant.

Bononi Law Group, Michael J. Bononi, Christy W. Granieri
and Rebecca L. Claudet for Plaintiff and Respondent.

_____

Jose Torrecillas agreed with his employer, Fitness International, to arbitrate claims. Instead Torrecillas sued in court. When Fitness moved to compel arbitration, the trial court deemed the agreement unconscionable. But there was little or no unconscionability of any sort. Fitness encouraged Torrecillas to consult a lawyer and their agreement included a term allowing amendments if both parties agreed. Torrecillas had the opportunity to bargain and had meaningful bargaining power. The agreement's terms are standard, not shocking. Torrecillas separately argues a different employee's case against Fitness preclusively dictates a conclusion of unconscionability, but that case had different facts and a different holding. We reverse.

I

Torrecillas had a lengthy and successful career at Fitness, according to his verified complaint.

In 1998, Torrecillas began as a sales associate at Fitness. Fitness promoted him to general manager after only three months. Torrecillas became Fitness's highest paid general manager nationwide from 2001 to 2006, partly due to performance bonuses. Torrecillas set many all-time sales records. Fitness awarded him recognition for Top Performing Presale and Most Successful Grand Opening. Torrecillas's records still stood in 2017.

Torrecillas resigned from Fitness in 2007 but returned in 2008 as a sales manager. Fitness promoted him to general manager of the Irvine club within only two months because he was the highest performing sales manager in California. In October 2008, Fitness promoted Torrecillas to general manager of

the Pico Rivera club, and then to general manager of the Downey club in August 2011.  In October 2011, Fitness asked Torrecillas to take over as general manager of the Upland club because it was the lowest-performing club in California and Torrecillas was one of Fitness's most successful general managers.  In only 30 days, Torrecillas transformed the Upland club into Fitness's highest California performer.

Torrecillas's excellent performance prompted Fitness to promote him to District Vice President in November 2011.  Torrecillas was Fitness's highest earning District Vice President in the nation for several consecutive months.  He was the only Vice President nationwide to hit the full $10,000 possible in performance bonuses.

In early 2013, Fitness promoted Torrecillas to Vice President of Marketing and Sales.  In this new position, Torrecillas became accustomed to making well over $100,000 a year from salary, bonuses, and commissions.

In September 2014, Fitness again promoted Torrecillas, now to Vice President of Personal Training.  A Fitness owner said Torrecillas was the "first round draft pick" for this position.

As Vice President of Marketing and Sales and again as Vice President of Personal Training, Torrecillas hired employees for Fitness.  Torrecillas oversaw 12 club locations.

Fitness fired Torrecillas on April 20, 2017.  Torrecillas sued Fitness on August 15, 2018.  Fitness moved to compel arbitration.

We recount the arbitration agreements between Torrecillas and Fitness.  There were two:  one in 2008, and another in 2013.

In 2008, Torrecillas signed an arbitration agreement when Fitness rehired him as a sales manager.  The agreement is two

3

pages long. It incorporates a 10-page document called "Dispute Resolution Rules and Procedures" (Rules).

The second agreement to arbitrate was in 2013, after Fitness promoted Torrecillas to Vice President of Sales and Marketing. The evidence about the second agreement is as follows.

To accompany its motion to compel arbitration, Fitness supplied a declaration of its Vice President for Human Resources, Mindy Stokesberry. According to Stokesberry, Fitness promoted Torrecillas to Vice President of Sales and Marketing in or around February 2013. At the same time he started in the new position, Torrecillas and Fitness negotiated and executed this second agreement, which Torrecillas signed in March 2013. During the time he was entering this agreement, Torrecillas easily could access the Rules via Fitness's intranet. Stokesberry signed her declaration on January 8, 2019.

Torrecillas submitted a one-page declaration, signed January 17, 2019, in opposition to Fitness's motion to compel arbitration. Regarding his 2013 agreement, Torrecillas declared Fitness promoted him to Vice President of Marketing and Sales in or around January 2013. After working in this new position for several months, Fitness presented Torrecillas with an employment agreement and told him he must sign it to remain in the position. Torrecillas declared he signed the agreement "because I needed to in order to keep my job."

Torrecillas's declaration omitted all information about the opportunity for and extent of contract negotiation with Fitness.

Torrecillas's declaration thus is not inconsistent with Stokesberry's assertion that Fitness and Torrecillas, during the process of promoting Torrecillas to Vice President of Marketing

4

and Sales, "negotiated and executed" this second employment agreement, which Torrecillas signed in March 2013.

Torrecillas signed the second agreement, a seven-page employment agreement, on March 10, 2013. The first paragraph of this individualized document stated in printed font that it was an agreement "between Jose Torrecillas" and Fitness. The document then recited Fitness currently employed Torrecillas as Vice President of Sales and Marketing and that Torrecillas wished to continue to be employed by Fitness.

The 2013 agreement covered a range of standard topics: conflict of interest rules; reimbursement policies; benefits; proprietary information rules; unfair competition; and so on. One topic was compensation. Torrecillas would earn a base salary of $100,000 a year plus the possibility of bonus compensation. Another topic, one introduced with an underlined heading, was "Dispute Resolution."

The 2013 agreement superseded earlier agreements. At the same time, it partially incorporated the 2008 arbitration agreement and the Rules as we now quote. The paragraph of the 2013 agreement titled "Dispute Resolution" says, with our italics, "Except for claims for equitable relief . . . and except where the law specifically forbids the use of arbitration as a final and binding remedy, *all disputes* between Employee and [Fitness] arising under this Agreement or relating to Employee's employment with [Fitness], including but not limited to the termination of that relationship, any allegations of unfair or discriminatory treatment arising under state or federal law, and claims for compensation and benefits, *shall be resolved exclusively by final and binding arbitration* in accordance with the [2008

arbitration agreement] and the [Rules], the provisions of which *are incorporated* herein."

The 2013 agreement stated it had been "negotiated by and between the parties . . . ." The agreement also stated Fitness advised Torrecillas to seek legal advice before signing. On the same page—which was the page Torrecillas signed—a provision allowed written amendments to the agreement.

The trial court denied Fitness's motion to compel arbitration because the agreement to arbitrate was unconscionable. The trial court's minute order was as follows: "Non-negotiable contracts of adhesion are procedurally unconscionable. In two places the agreement states that if plaintiff refuses to sign, he will not be considered for employment. ¶ Limits on discovery is substantively unconscionable. The agreement limits depositions to 5, unless a motion is made to the arbitrator. ¶ Both types of unconscionability are present. ¶ The Motion to Compel Arbitration filed by Fitness International, LLC on 01/09/2019 is Denied."

II

Our review is independent. (*Pinnacle Museum Tower Assn. v. Pinnacle Market Development (US), LLC* (2012) 55 Cal.4th 223, 236 (*Pinnacle*).)

Torrecillas has the burden of proving unconscionability. (*OTO, L.L.C. v. Kho* (2019) 8 Cal.5th 111, 126 (*Kho*) [party asserting unconscionability must prove it].)

The Federal Arbitration Act (9 U.S.C. § 1 et seq.) ("the Act") applies, as Torrecillas agreed at oral argument. Torrecillas had to concede this point: Fitness operates health clubs in many

6

states and Torrecillas's employment related to this interstate commerce.  The Rules specifically adopt the Act as well.

The Act favors enforcement of arbitration agreements.  (9 U.S.C. § 2.)  California law, like federal law, strongly favors arbitration.  (*Kho*, *supra*, 8 Cal.5th at p. 125.)

Generally applicable contract defenses, like unconscionability, can invalidate arbitration agreements.  (9 U.S.C. § 2; *Armendariz v. Foundational Health Psychcare Services, Inc.* (2000) 24 Cal.4th 83, 114 (*Armendariz*).)

The unconscionability standard must be the same for arbitration contracts as for any other contract.  The Act preempts state unconscionability rules that interfere with fundamental attributes of arbitration.  (*AT&T Mobility LLC v. Concepcion* (2011) 563 U.S. 333, 341–344 (*Concepcion*); see *Kho*, *supra*, 8 Cal.5th at pp. 123–124.)

As a matter of general contract law, California courts require both procedural and substantive unconscionability to invalidate a contract.  (*Kho*, *supra*, 8 Cal.5th at p. 125.)  We apply a sliding scale, meaning if one of these elements is present to only a lesser degree, then more evidence of the other element is required to establish overall unconscionability.  (*Ibid.*)  In other words, if there is little of one, there must be a lot of the other.

We reverse because there was little or none of either element.

A

There was little procedural unconscionability.

The procedural inquiry is about the manner in which the parties formed the contract.  (*Baltazar v. Forever 21, Inc.* (2016) 62 Cal.4th 1237, 1243 (*Baltazar*).)

7

An initial issue is whether the contract was an adhesion contract. Adhesion contracts are form contracts a party with superior bargaining power offers on a take-it-or-leave-it basis. (*Graham v. Scissor-Tail, Inc.* (1981) 28 Cal.3d 807, 817 (*Graham*).)

Torrecillas says his 2013 agreement was a contract of adhesion. This is not quite accurate. As we will explain, to a degree the parties customized this agreement specifically to Torrecillas, and Torrecillas did have an opportunity to negotiate; Fitness did not offer the agreement on a stark take-it-or-leave-it basis. But in all likelihood the contract's text started as a form on one of Fitness's corporate word processors. There is no evidence for the unlikely notion Fitness and Torrecillas sat down and said, "Well, let's see. What terms do you think the two of us should put in this employment contract?"

Whether the agreement was or was not a contract of adhesion is not the core question. Rather, from the standpoint of determining whether there was procedural unconscionability, the core issues are surprise and oppression.

Surprise differs from oppression. Surprise is when a prolix printed form conceals the arbitration provision. (*Kho*, *supra*, 8 Cal.5th at p. 126.) Oppression, on the other hand, occurs when there is a lack of negotiation and meaningful choice. (*Ibid*.) The presence of surprise or oppression requires higher scrutiny of the contract. (*Baltazar*, *supra*, 62 Cal.4th at p. 1245.)

Torrecillas does not and cannot argue surprise. The 2008 arbitration agreement had no elements of surprise. It was but three pages long and was in a conventional font. Its title, in large and bold font, was in plain English:

**L.A. FITNESS INTERNATIONAL LLC EMPLOYMENT**

# APPLICATION AND ARBITRATION AGREEMENT

The Rules shared these features.

Neither was the 2013 employment agreement surprising. It too was in conventional font. The pertinent heading was underlined: "<u>Dispute Resolution</u>." Earlier in this opinion, we quoted and italicized the key language in this paragraph. Its language is reasonably direct and clear. There is nothing surprising about it.

We proceed to the question of oppression.

Oppression is the absence of negotiation or meaningful choice. (*Pinnacle*, *supra*, 55 Cal.4th at p. 247.)

Form contracts are not per se oppressive, but they do carry a danger of oppression. (See *Graham*, *supra*, 28 Cal.3d at p. 818.) There may be a worrisome imbalance in bargaining power. The most sought-after employees can counter this pressure in the employment context. (Cf. *Kho*, *supra*, 8 Cal.5th at p. 127 [economic pressure exerted by employers may be particularly acute on all but the most sought-after employees].)

We examine the manner and circumstances of the 2013 agreement to discern whether there was an absence of negotiation or meaningful choice.

Torrecillas agreed to arbitrate in 2008 and again in 2013. In his respondent's brief, he analyzes the circumstances of the 2008 agreement without explaining how, even if we found this earlier agreement flawed, it would negate the more recent one. The 2013 agreement says all disputes relating to Torrecillas's employment must be resolved by arbitration. We analyze this more recent agreement.

The evidence shows Torrecillas and Fitness negotiated his 2013 employment agreement. The Stokesberry declaration

establishes this fact.  The text of the agreement does as well.  That agreement likewise states Fitness advised Torrecillas that he should seek legal advice before executing the agreement, that he understood his right to consult with counsel, and that he was voluntarily and freely entering the agreement.  The agreement also states the parties may amend the agreement so long as amendments are in writing and signed by Torrecillas and Fitness.

Torrecillas's version of events is not inconsistent with Stokesberry's version and with the text of the agreement.  Torrecillas declared Fitness presented him with an employment agreement "and told me I must sign it to remain in the position.  I signed the Employment Agreement because I needed to in order to keep my job."  Fitness told Torrecillas he had to sign an employment agreement to remain Vice President of Marketing and Sales, where Fitness was paying him over $100,000 a year.  Fitness and Torrecillas negotiated the agreement, as Fitness asserted and as Torrecillas did not dispute.

The contracting process here contrasts with the recent *Kho* case.  In *Kho*, an extreme level of procedural unconscionability infected car mechanic Ken Kho's agreement to arbitrate with his employer, an auto dealership called One Toyota of Oakland.  (*Kho*, *supra*, 8 Cal.5th at pp. 126–129.)  *Kho* differs from this case in seven ways.

1. In *Kho*, Toyota made Kho sign the arbitration agreement "immediately."  (*Kho*, *supra*, 8 Cal.5th at p. 127.)  Kho had no time even to read the documents.  (*Id*. at p. 118.)  Here, Torrecillas presented no evidence Fitness exerted time pressure.

10

2. In *Kho*, Toyota had a "porter" present the document to Kho at his work station, thus compounding the demand for an immediate signature with the message the low level porter could explain and negotiate nothing. (*Kho*, *supra*, 8 Cal.5th at pp. 118, 127.) Fitness, by contrast, delivered the opposite message to Torrecillas: Fitness wanted an employment agreement of some sort, but its terms were negotiable.

3. In *Kho*, the employer used a piece-rate compensation system, meaning any time Kho spent reviewing the agreement at his work station reduced his pay. (*Kho*, *supra*, 8 Cal.5th at p. 127.) Fitness, by contrast, paid Torrecillas an annual salary. Fitness's compensation system did not encourage Torrecillas to sign swiftly or thoughtlessly.

4. The agreement in *Kho* was a "paragon of prolixity" in "extremely small font" that was barely legible. (*Kho*, *supra*, 8 Cal.5th at p. 128.) None of these defects plagued Torrecillas's contracts. The fonts and wording were conventional. Torrecillas reported no difficulty in reading or comprehending them.

5. In *Kho*, the employer made it impossible for Kho to consult with an attorney about the deal. (*Kho*, *supra*, 8 Cal.5th at p. 127.) Here, Fitness encouraged it.

6. Toyota did not give Kho a copy of what he had signed. (*Kho*, *supra*, 8 Cal.5th at p. 128.) Torrecillas, however, had unrestricted computer access to the Rules. Or, "if he preferred, he was able to obtain a hard copy from the Human Resources department."

7. Car mechanic Kho had the same job at a Toyota dealership for only about four years. (*Kho*, *supra*, 8 Cal.5th at pp. 118–119.) The facts showed Kho to be an undistinguished novice, fungible from his employer's perspective. Torrecillas was different. Fitness had employed Torrecillas for decades and knew his worth to the company. Torrecillas proved his outstanding value to Fitness, which steadily promoted him, gave him awards, and eventually put him in a position of hiring and managing other employees. Torrecillas had long-term and significant experience with corporate culture. He negotiated his employment agreement while his career was in ascent: Fitness had just given him one big promotion and the following year would give him another, telling him he was the "first round draft pick" for the next promotion. Torrecillas's bargaining position with Fitness was different than Kho's with Toyota.

Torrecillas points to a 1997 case, *Stirlen v. Supercuts, Inc.* (1997) 51 Cal.App.4th 1519, but that case is inapposite for three reasons. First, undisputed evidence in *Stirlen* showed the contract terms were nonnegotiable (*id.* at p. 1534), but Fitness asserted and offered evidence the contract here was negotiable. Second, the *Stirlen* court found significant substantive unconscionability including lack of mutuality due to several one-sided provisions in the arbitration agreement. (*Id.* at pp. 1536–1542.) As we explain in the next section, the level of substantive unconscionability in this case is small or nil. Finally, *Stirlen* was decided before the United States Supreme Court case *Concepcion*, *supra*, 563 U.S. 333. Post-*Concepcion*, aside from quoting two

12

words from *Stirlen* as part of a list of different *substantive* unconscionability standards, the California Supreme Court has not mentioned *Stirlen*. (See *Sonic-Calabasas A., Inc. v. Moreno* (2013) 57 Cal.4th 1109, 1145; *Sanchez v. Valencia Holding Co., LLC* (2015) 61 Cal.4th 899, 910 (*Sanchez*); *Baltazar*, *supra*, 62 Cal.4th at p. 1244; *Kho, supra*, 8 Cal.5th at p. 129.)

As Torrecillas's employer and the primary drafter of the agreement, Fitness had some level of superior bargaining power. Yet Torrecillas points to no sharp practices triggering a higher level of contract scrutiny. (*Baltazar, supra*, 62 Cal.4th at p. 1245 [no heightened scrutiny because employer did not lie to employee, place employee under duress, or otherwise manipulate employee into signing].)

In sum, Torrecillas encountered little procedural unconscionability.

For Torrecillas to invalidate his agreement, then, minimal procedural unconscionability means Torrecillas would have to demonstrate a high degree of substantive unconscionability. We turn to that topic.

B

There was little or no substantive unconscionability.

The substantive inquiry considers whether the overall bargain is overly harsh or unreasonably one-sided. (*Armendariz, supra*, 24 Cal.4th at p. 114.) California courts have stated the standard variously, defining it as, for example: so one-sided as to shock the conscience (*Pinnacle, supra*, 55 Cal.4th at p. 246); unduly oppressive (*Perdue v. Crocker National Bank* (1985) 38 Cal.3d 913, 925); and unfairly one-sided (*Little v. Auto Stiegler, Inc.* (2003) 29 Cal.4th 1064, 1071). Our high court has acknowledged these variations and has clarified the differing

13

formulations mean the same thing.  (*Sanchez*, *supra*, 61 Cal.4th at p. 911.)

Torrecillas's deal with Fitness does not shock the conscience, for its terms are standard rather than shocking.

Torrecillas says seven provisions are shocking.  This attack fails.

First, Torrecillas says the agreement unreasonably limits discovery.  Under the Rules, initial disclosure requires each party swap "any and all documents relevant to any claim or defense."  Each party is entitled to 30 interrogatories and five depositions.  A party may request documents the opposing party used to support interrogatory responses.  The arbitrator may permit additional discovery at a party's request and after a showing of substantial need.

The trial court found substantive unconscionability based on the five-deposition limit.  The finding of procedural unconscionability based on discovery limitations was incorrect for three reasons.

First, Torrecillas submitted no evidence that five depositions were too few or that other discovery limits created significant barriers to pursuing his claims.  (*Baxter v. Genworth North America Corp.* (2017) 16 Cal.App.5th 713, 729 [unconscionability requires a *factual* showing that the discovery limitations would as a practical matter thwart employees' ability to prove their particular claims].)  In his appellate brief, Torrecillas argues he requires certain documents and witnesses to pursue his claims.  Arguments are not evidence.

Second, the arbitrator can grant discovery beyond these limits on a showing of substantial need.  We must presume the arbitrator will behave reasonably.  (*Dotson v. Amgen, Inc.* (2010)

14

181 Cal.App.4th 975, 984.)  Torrecillas suggests no basis for a contrary presumption.

Third, limiting discovery is one point of arbitration.  A central goal is efficiency.  A streamlined discovery process promotes this goal.  (*Armendariz, supra*, 24 Cal.4th at p. 106, fn. 11 [discovery limits effectuate the simplicity, informality, and expedition that are important goals of arbitration].)

We also address the specific discovery provisions Torrecillas challenges.  At the outset we underline each provision is flexible, not rigid, because the arbitrator may permit additional discovery at a party's request and after a showing of substantial need.

The deposition limit is standard.  (See *Sanchez v. Carmax Auto Superstores Cal., LLC* (2014) 224 Cal.App.4th 398, 405–406 [three depositions not unconscionable]; *Armendariz, supra*, 24 Cal.4th at p. 105, fn. 10 [no depositions unless approval from arbitrator is adequate discovery].)  A limit of five depositions is not shocking.

The limit of 30 interrogatories is more than federal court rules confer and is not shocking.  (See Fed. Rules Civ. Proc., rule 33, 28 U.S.C. [no more than 25].)

The absence of provisions for requesting documents and admissions is not substantively unconscionable.  Torrecillas can get documents through the initial disclosures and interrogatories.  And if he requests and shows a substantial need, he can get additional discovery.  This process does not prevent Torrecillas from propounding document demands or requests for admissions.

Torrecillas raises another argument about discovery, styling it as a distinct argument from unconscionability.  He says the discovery procedures render the arbitration agreement

15

unenforceable as a matter of law under *Armendariz*, *supra*, 24 Cal.4th 83. Specifically, he says the five deposition limit and absence of provisions for requesting documents and for requesting admissions are inadequate to prosecute his claims for unwaivable statutory rights. Like his argument that these discovery procedures are unconscionable, this argument also fails.

Under *Armendariz*, Torrecillas is entitled to "adequate," not unlimited, discovery. (*Armendariz*, *supra*, 24 Cal.4th at pp. 105–106.) Torrecillas has no evidence showing discovery was inadequate. Furthermore, these procedures sufficed under *Armendariz*. Adequate discovery includes access to essential documents and witnesses, *as determined by the arbitrator*. (*Id.* at p. 106.) *Armendariz* found adequate discovery when the parties needed the arbitrator's approval to take *any* depositions. (*Id.* at p. 105, fn. 10.) Here, Torrecillas is entitled to five depositions regardless of the arbitrator's approval. *Armendariz* approved of arbitrator discretion. Here, the arbitrator has discretion to allow additional discovery, including more depositions, document requests, or requests for admissions. The discovery procedures are enforceable as a matter of law.

Thus, Torrecillas's discovery arguments all fail.

Next we turn to the six other provisions Torrecillas says are substantively unconscionable.

Torrecillas argues the agreement is overbroad. The 2013 agreement limits the scope of arbitration to disputes between Fitness and Torrecillas arising under the 2013 agreement or relating to Torrecillas's employment. This is not overbroad. This is an employment contract. It pertains to employment. It is not unfair.

16

Torrecillas cites language from the 2008 agreement and the Rules to say Torrecillas's agreement is overbroad. He is incorrect. The 2008 agreement *was* broader and applied to controversies "whether or not arising out of or related to my application, employment, or its termination." The 2013 agreement, however, superseded the 2008 agreement and the Rules. The 2013 agreement said the types of disputes it listed, those arising under the 2013 agreement or relating to employment, must be resolved, with our emphasis, "*in accordance* with the [2008 arbitration agreement] and the [Rules], the provisions of which are incorporated herein." In doing so, the 2013 agreement followed the 2008 agreement and the Rules, but only for the types of disputes the 2013 agreement listed. To the extent the 2008 agreement or the Rules included a broader scope, the 2013 agreement thus narrowed that scope. The 2013 agreement is not overbroad.

His third argument, lack of mutuality, similarly fails. An agreement lacks mutuality if it requires one party but not the other to arbitrate claims. (*Armendariz, supra*, 24 Cal.4th at p. 120.) The 2013 agreement requires arbitration of "all disputes between [Torrecillas] and [Fitness]." This demonstrates mutuality, not unconscionability.

Torrecillas incorrectly claims in his fourth and fifth arguments the agreement improperly bars him from pursuing a cause of action under the Unfair Competition Law (Bus. & Prof. Code, § 17200 et seq.) and under the Private Attorneys General Act (Lab. Code, § 2698).

As for the Unfair Competition Law claim, Torrecillas brings one cause of action under the law but he seeks the type of relief that *is* arbitrable. He alleges Fitness failed to pay him wages on

17

time and failed to reimburse him for business expenses.  He seeks two types of relief:  1) "full restitution, disgorgement, and/or specific performance of payment of all wages that have been unlawfully withheld" and 2) an injunction prohibiting Fitness from "continuing to engage in the practices described above." Both types of relief are arbitrable.

Unfair Competition Law actions for equitable monetary relief, including restitution and disgorgement, are arbitrable (*Cruz v. PacifiCare Health Systems, Inc.* (2003) 30 Cal.4th 303, 320 (*Cruz*)), making the first type of relief Torrecillas seeks arbitrable.

Torrecillas's request for an injunction is private in nature and therefore arbitrable.  *Cruz* limited arbitration of claims for *public* injunctive relief, not claims for private injunctive relief. (*Clifford v. Quest Software Inc.* (2019) 38 Cal.App.5th 745, 751 (*Clifford*); *McGill v. Citibank, N.A.* (2017) 2 Cal.5th 945, 955–956 (*McGill*) [distinguishing public injunctive relief from private injunctive relief and stating *Cruz* applies to public injunctive relief].)  Relief that would primarily redress or prevent injury to an individual plaintiff or to a group of individuals similarly situated to the plaintiff is not public injunctive relief.  (*McGill*, *supra*, 2 Cal.5th at p. 955.)

Torrecillas sought a private injunction, which is arbitrable. His request was for an injunction to stop Fitness from engaging in the practices "described above."  Those practices were Fitness's alleged failures to pay Torrecillas.  The beneficiary of an injunction would be Torrecillas and possibly Fitness's current employees, not the public at large.  (*Clifford*, *supra*, 38 Cal.App.5th at p. 753 [injunction to prevent employer from committing further unfair business practices was a request for

18

private injunctive relief that could help only current employees rather than the public at large]; cf. *Cruz, supra*, 30 Cal.4th at p. 315 [injunction to prevent health insurer's alleged deceptive advertising practices was "clearly for the benefit of health care consumers and the general public" and therefore not arbitrable].) Torrecillas's Unfair Competition Law claims thus are arbitrable.

As for the claim about the Private Attorneys General Act, Torrecillas's argument is odd because he did not sue under that law. Nonetheless, as to claims under both laws, the 2013 agreement resolves any conflict between the laws and arbitration by excluding arbitration "where the law specifically forbids [it]." So the agreement steers clear of what, in this case, is not an issue. This does not demonstrate unconscionability.

His sixth and seventh arguments, about filing fees, also fail. To initiate arbitration, an employee must pay Fitness a filing fee "equivalent to the amount required for the employee to file a complaint in court." Fitness would pay any remaining filing fee the arbitrator required. Torrecillas says this provision is unfair, and he challenges the absence of a fee exception for indigent people. *Armendariz, supra*, 24 Cal.4th at pages 111–112, explains arbitration cannot require the employee to bear expenses the employee would not have to bear if the employee could bring the action in court. By pegging the fee to the fee an employee would have to pay in court, the agreement complies with *Armendariz*. Torrecillas does not claim indigence or show he would qualify for a fee exception. Even if he did, again, the fee agreement is keyed to what an employee would have to pay to file in court. That means an employee who would qualify for a fee waiver in court would owe the "equivalent" amount in

arbitration, which would possibly be nothing. The filing fees do not shock the conscience.

Torrecillas has not shown a high level of substantive unconscionability. His unconscionability defense fails.

                                  III

Torrecillas incorrectly says issue preclusion prevents Fitness from compelling arbitration.

Issue preclusion applies:

(1) after final adjudication;

(2) of an identical issue;

(3) actually litigated and necessarily decided; and

(4) asserted against one who was a party in the first suit. (*Samara v. Matar* (2018) 5 Cal.5th 322, 327.)

The purportedly preclusive case is the unpublished case *Pimpo v. Fitness International, LLC* (Sept. 13, 2017, D071140) (*Pimpo*).

The trial court did not rule on issue preclusion. Its order said nothing about *Pimpo*.

The *Pimpo* court affirmed a trial court order denying Fitness's motion to compel arbitration. (*Pimpo, supra*, D071140 at pp. [23–24].) The employee in that case agreed to arbitrate when she applied online to work for Fitness. (*Id.* at p. [12].) Fitness hired her to work at a gym. (*Id.* at p. [2].) Within a week of starting work, she said a coworker began sexually harassing her. (*Ibid.*) She filed a lawsuit against Fitness alleging sexual harassment, failure to prevent sexual harassment, and other causes of action. (*Id.* at p. [3].) The employee's only agreement to arbitrate was the one in her employment application, which had expired before she brought her lawsuit. (*Id.* at pp. [12–13].)

20

In analyzing procedural unconscionability, the *Pimpo* court noted the employee's agreement was part of her employment application and the employee declared she lacked the money for an attorney to review her job applications. (*Pimpo*, *supra*, D071140 at pp. [13–14].) The court also found the scope of the arbitration agreement "incredible" because it could apply if she got into a car accident with a Fitness employee or if she hurt herself on workout equipment as a gym member. (*Id.* at p. [16].)

The *Pimpo* case has no preclusive effect on Torrecillas's case because the issue is not identical. Unconscionability is a fact-specific defense. (*Kho*, *supra*, 8 Cal.5th at p. 124.) The employee in *Pimpo* signed the agreement when she *applied* for the job. She declared she could not afford an attorney. The facts are different here—radically so. Torrecillas was not applying for a job but receiving a promotion. He signed the 2013 agreement as an award-winning employee with a long tenure at Fitness. He had been District Vice President, was starting a job that paid six-figure compensation, and was silent about whether he could afford an attorney to review his employment contract.

Torrecillas's argument also relies on similarities between the *Pimpo* agreement and his 2008 agreement, but this ignores the pertinent and different 2013 agreement. As we have explained, the 2013 agreement limited the scope of arbitration to disputes relating to the agreement and Torrecillas's employment. Torrecillas's agreement did not include the types of disputes the *Pimpo* court described because a car accident with a Fitness employee or an injury from fitness equipment as a gym member would not be related to the agreement or related to his employment. The *Pimpo* case does not control.

## DISPOSITION

The order is reversed. On remand, the trial court shall compel arbitration of all arbitrable claims. Costs are awarded to Fitness International, LLC.


WILEY, J.


We concur:


BIGELOW, P. J.


STRATTON, J.